**Michele Y. TERRAN, as legal representative of Julie F. TERRAN, a minor, Petitioner–Appellant,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent–Appellee.**

No. 98–5161.

United States Court of Appeals, Federal Circuit.

Oct. 27, 1999.

Andrew W. Dodd, of Torrance, California, argued for petitioner-appellant.

Claudia G. Gangi, Trial Attorney, Torts Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent-appellee. With her on the brief were Helene M. Goldberg, Director and John Lodge Euler, Deputy Director.

Before PLAGER, LOURIE, and CLEVENGER, Circuit Judges.

Opinion for the court filed by Circuit Judge CLEVENGER. Dissenting opinion filed by Circuit Judge PLAGER.

CLEVENGER, Circuit Judge.

Michele Terran appeals from the judgment by the United States Court of Federal Claims sustaining the Special Master's decision to deny compensation to Julie F. Terran under the National Child Vaccine Injury Act of 1986 (the "Vaccine Act" or "Act"). *See Terran v. Secretary of Dept. of Health & Human Services*, 41 Fed.Cl. 330 (Fed.Cl.1998). Terran argues that the Vaccine Injury Table applied by the Special Master to her claim is invalid because the statutory scheme pursuant to which it was created is unconstitutional, and also that the Court of Federal Claims erred both legally and factually in sustaining the Special Master's ruling. We hold, however, that the Vaccine Act does not violate separation of powers principles, and that the Court of Federal Claims committed no reversible error. We therefore affirm.

## I

This appeal raises three issues: (i) whether the Court of Federal Claims has jurisdiction to adjudicate constitutional challenges to the validity of the current Vaccine Injury Table, which was promulgated by the Secretary pursuant to 42 U.S.C. § 300aa–14(c) and which became effective on March 10, 1995 (the "1995 Table"); (ii) whether the section of the Vaccine Act that authorizes the Secretary to create the 1995 Table, see 42 U.S.C. § 300aa–14(c) (1994), violates separation of powers principles found in the Constitution; and (iii) whether the Court of Federal Claims erred in sustaining the Special Master's decision to deny Julie compensation under the Vaccine Act.

## A

The relevant facts are not in dispute. Julie Terran was born on February 10, 1992, in Phoenix, Arizona, and was discharged in good health from the hospital the next day. Julie received her first diphtheria-pertussis-tetanus ("DPT") vaccination when she was two months old, and her second DPT vaccination when she was three and one-half months old. On August 10, 1992, when Julie was six months old, she received her third DPT vaccination. Julie received her fourth DPT vaccination on September 22, 1993. All of the vaccinations were given by Dr. Gary Berebitsky, Julie's pediatrician, at her well-baby care checkup examinations. The first three DPT vaccines utilized whole cell pertussis bacteria, whereas the fourth was an acellular DPT vaccine. Julie's third vaccination, which occurred on August 10, 1992, is the basis for this dispute.

On August 11, 1992, the day after her third DPT vaccination, Julie experienced a seizure lasting approximately seven seconds which caused one of her arms to become stiff. The next day, August 12, Julie suffered four afebrile seizures, each lasting roughly one minute in length. Immediately after the seizures, Julie was rushed by ambulance to Phoenix Children's Hospital, where she was admitted. On August 13, in the presence of hospital personnel, Julie suffered another seizure lasting approximately five and one-half minutes. Hospital personnel then administered the anti-convulsant drug Phenobarbital to Julie. In the seven days following Julie's third DPT vaccination, she experienced a total of approximately twelve minutes of seizure activity. On September 12, roughly one month after the vaccination in question, Julie suffered a seizure lasting 50 minutes even though she was on Phenobarbital at the time. Julie's seizures continue to this day.

On September 13, 1993, Dr. Berebitsky noted that Julie was "well appearing" and "neurologically intact." However, in November 1993, he noted a problem with Julie's neurological condition, indicating that she scored a borderline passing grade on the Denver Developmental Screening Test. Julie is currently mentally retarded.

Julie also had a meningocele lump removed from her skull as a young child. Prior to her third DPT vaccination, Julie's doctors conducted several tests to determine whether she suffered any permanent brain damage as a result of the lump. These tests concluded that she had no brain abnormalities. An MRI scan conducted on May 18, 1992, showed that Julie had normal brain structure, and a test showed that there was no cancer in the removed lump. A certified pediatric neurosurgeon conducted a follow-up on Julie's surgery and found her neurological condition to be unremarkable except for moderate strabismus. Two MRI's conducted after Julie's third vaccination showed that she had no structural pathology in her brain. In connection with Terran's claim for compensation under the Vaccine Act, the Government requested that Julie undergo two separate genetic workups, both of which showed normal results.

## B

Childhood vaccinations, though an important part of the public health program, are not without risk. Because vaccines often contain either killed bacteria or live

but weakened viruses, they can cause serious adverse effects. *See O'Connell v. Shalala,* 79 F.3d 170, 172 (1st Cir.1996) (citing Committee to Review the Adverse Consequences of Pertussis and Rubella Vaccines, Institute of Medicine, Adverse Effects of Pertussis and Rubella Vaccines 1 (1991)). Despite the relatively rare occurrence of such problems, Congress became concerned that tort liability and related costs might drive up the prices of vaccines and discourage vaccine manufacturers from staying in this market, and that normal tort litigation might leave many sufferers of vaccine-caused injuries uncompensated. *See* H.R.Rep. No. 99–908, at 1, 4, 6–7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6344, 6345, 6347–48; *see also O'Connell,* 79 F.3d at 172–73.

Accordingly, in 1986, Congress passed the National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, 1986 U.S.C.C.A.N. (100 Stat.) 3755 (codified as amended at 42 U.S.C. §§ 300aa–1 to –34 (1994)), which established a program administered by the Secretary of Health and Human Services ("Secretary") to increase the safety and availability of vaccines. *See* 42 U.S.C. § 300aa–1 (1994). As part of this program, Congress established a Vaccine Injury Compensation Program through which claimants could petition to receive compensation for vaccine-related injuries or death. *See id.* § 300aa–10(a). To receive compensation, a claimant must petition the Court of Federal Claims and demonstrate by a preponderance of the evidence either that (i) the vaccinated child suffered an injury listed on a table, or a complication or "sequela" thereof; or (ii) that the vaccine caused or significantly aggravated the child's injury or condition. *See id.* §§ 300aa–11, –13 to –14; 42 C.F.R. § 100.3 (1996). Thus, the Vaccine Act provides two possible ways for a claimant to receive compensation: first, by showing that she suffered a "table injury," or second, by proving causation in fact.[1] The Vaccine Act establishes an Office of Special Masters within the United States Court of Federal Claims to decide petitions for compensation, provides for review of a Special Master's decision by the Court of Federal Claims, and allows appeal of the Court of Federal Claims's rulings to this court. *See* 42 U.S.C. § 300aa–12 (1994).

To aid the Vaccine Program's goal of providing efficient compensation for vaccine injuries, Congress provided, in the form of a table, a list of vaccines, a parallel list of adverse medical conditions commonly associated with the use of each vaccine, and, for certain medical conditions, a time period in which the first symptoms should become apparent following vaccination. *See id.* § 300aa–14(a). These listings comprise the initial Vaccine Injury Table (the "Initial Table"), and are to be read in conjunction with a separate subsection, the "Qualifications and aids to interpretation" (the "QAIs"), that provides explanations and definitions for terms used in the Initial Table. *Id.* § 300aa–14(b). To demonstrate a table injury, a claimant must prove that within the prescribed time period following a vaccination, she suffered one of the disorders set forth on the Vaccine Injury Table corresponding to the vaccine administered. If she cannot make this showing, she must instead prove causation in fact. For example, with respect to a DPT vaccine, the Initial Table grants recovery if the claimant suffers, *inter alia,* a first symptom of, or a first manifestation of onset of, "residual seizure disorder" or "encephalopathy" within three days of receiving the vaccine. *See id.* The QAIs define "encephalopathy" to mean "any significant acquired abnormality of, or injury

---

1. However, the Vaccine Act does not preclude traditional tort remedies. A person claiming injury due to a vaccine is required to seek redress first through the Vaccine Act, but if she is not satisfied with the result, she may reject the judgment and litigate her claim in federal or state courts, subject to certain limitations imposed by the Vaccine Act. *See* 42 U.S.C. §§ 300aa–11(a), 300aa–21 (1994); *Schafer v. American Cyanamid Co.,* 20 F.3d 1, 2–3 (1st Cir.1994) (discussing the relation between the Vaccine Act and the traditional tort system).

to, or impairment of function of the brain," and set forth certain symptoms or manifestations of an encephalopathy. *Id.* § 300aa–14(b)(3)(A).

Congress included the Initial Table in the Vaccine Act legislation, rather than delegating the creation of the first injury table to the Secretary, because it was concerned that the administrative process would significantly delay the implementation of the Vaccine Compensation Program. *See* Vaccine Injury Compensation: Hearings on H.R. 5810 Before the Subcomm. on Health and the Env't of the House Comm. on Energy and Commerce, 98th Cong. 210–11 (1984) (letter from Martin H. Smith, Vice President, American Academy of Pediatrics to Representative Henry A. Waxman). Congress intended the Secretary to revise and update the Initial Table with more accurate information that would become available as a result of the research on vaccine injuries mandated by the Vaccine Act. *See* National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660, § 312, 1986 U.S.C.C.A.N. (100 Stat.) 3755, 3779–81 (requiring the Secretary to make findings on the accuracy of the Initial Table with respect to, *inter alia*, pertussis vaccines and to propose regulations to modify the Initial Table accordingly); H.R.Rep. No. 99–908, at 18, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6359. Thus, the Vaccine Act gives the Secretary the express power to promulgate regulations that modify the Table by adding to, or deleting from, the list of compensable disorders and by revising the time periods contained in the Table. *See* 42 U.S.C. § 300aa–14(c)(3) (1994). The Vaccine Act requires the Secretary to make such modifications pursuant to notice and comment rulemaking, and to provide at least 180 days for public comment and an opportunity for a public hearing. *See id.* § 300aa–14(c)(1). In addition, the Act provides that if the Initial Table is modified, the original QAIs cease to apply unless the modified Table expressly states that they remain valid. *See id.* § 300aa–14(c)(4). In February 1995, the Secretary promulgated regulations creating the current Vaccine Injury Table (the "1995 Table") and associated new QAIs, which became effective on March 10, 1995. *See* 42 C.F.R. § 100.3 (1996). As relevant to this case, the 1995 Table and associated QAIs deleted residual seizure disorder ("RSD") from the list of compensable table injuries related to DPT vaccine and significantly narrowed the definition of "encephalopathy." The 1995 Table and the modified QAIs apply to all petitions filed on or after their effective date of March 10, 1995. *See* 42 U.S.C. § 300aa–14(c)(4) (1994).

## C

Terran filed a petition for compensation with the Court of Federal Claims on July 12, 1995. The petition alleged that Julie's third DPT vaccination, administered on August 10, 1992, caused Julie to suffer both RSD and encephalopathy. Because the 1995 Table does not list RSD as a compensable injury associated with DPT vaccine, the Special Master concluded that Terran must establish causation in fact to prevail on this count. With respect to encephalopathy, Terran conceded that Julie's disorder did not meet the definition of an encephalopathy as set forth in the revised QAIs, and the Special Master accordingly concluded that Terran could prevail only if she demonstrated causation in fact for this illness as well. *See Terran v. Secretary of Health & Human Services*, No. 95–451V, slip op. at 8–9 (Fed. Cl. (Special Master) Jan. 23, 1998). After examining the medical records and testimony, the Special Master determined that Terran failed to establish a prima facie case of causation in fact for either of Julie's conditions and denied compensation. *See id.* at 18.

Terran sought review of the Special Master's findings in the Court of Federal Claims. In her motion for review, Terran first alleged that the Vaccine Act is unconstitutional insofar as it authorizes the Secretary to modify the statutorily-enacted Initial Table found at 42 U.S.C. § 300aa–14(a) via administrative rulemaking. Sec-

ond, Terran argued that even if the 1995 Table was valid, the Special Master erred in applying it to Julie's case and that he improperly rejected her theory of causation in fact under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court of Federal Claims held that it was without jurisdiction to consider Terran's constitutional challenge, and sustained the Special Master's decision in all respects. *See Terran*, No. 95–451V, slip op. at 5, 10. Terran then petitioned for review to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) and 42 U.S.C. § 300aa–12(f).

## II

■■■ We consider first the Court of Federal Claims's ruling that it does not have jurisdiction to consider appellant's constitutional challenge to the Vaccine Act. We review questions involving the jurisdiction of the Court of Federal Claims *de novo. See Widdoss v. Secretary of Dept. of Health & Human Services*, 989 F.2d 1170, 1174 (Fed.Cir.1993). Determining the jurisdiction of the Court of Federal Claims necessarily involves statutory interpretation, which we likewise review *de novo. See Munn v. Secretary of Dept. of Health & Human Services*, 970 F.2d 863, 870 (Fed.Cir.1992); *Neher v. Secretary, Dept. of Health & Human Services*, 984 F.2d 1195, 1197–98 (Fed.Cir.1993).

## A

■■ The Court of Federal Claims found that it lacked jurisdiction on two grounds. Reciting the well-known fact that it only has jurisdiction to hear claims against the Government for money damages, the court ruled that Terran's argument that the Vaccine Act violated the Presentment Clause of the Constitution, *see* U.S. Const. art. I, § 7, cl. 2, was not based on a "money mandating provision" of the Constitution, thereby depriving it of jurisdiction. *See Terran v. Secretary of Dept. of Health & Human Services*, 41 Fed.Cl. 330, 334 (Fed. Cl.1998) (citing *Carruth v. United States*,

224 Ct.Cl. 422, 627 F.2d 1068, 1081 (Ct.Cl. 1980)).

■■ It is well understood that the Court of Federal Claims, like all federal courts, is a court of limited jurisdiction. Its jurisdiction is defined by the Tucker Act, which gives that court authority to

> render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1994). The Supreme Court has interpreted this language to mean that a plaintiff who seeks redress in the Court of Federal Claims must present a claim for "actual, presently due money damages from the United States." *United States v. King*, 395 U.S. 1, 3, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *see also United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Although the Tucker Act provides jurisdiction for damage suits against the United States Government, it is equally clear that the Tucker Act does not itself create a cause of action against the Government. Rather, a plaintiff seeking recovery against the Government in the Court of Federal Claims must point to a money-mandating constitutional provision, statute, regulation, or contract with the United States affording it a right to money damages. *See United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed.Cir.1994) (en banc); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc).

■■■ We think that the Court of Federal Claims misconstrued the scope of its jurisdiction. The Presentment Clause of the Constitution states that before becoming law, a legislative act must be approved by both houses of Congress and must be presented to the President of the United

States for approval. *See* U.S. Const. art. I, § 7, cl. 2. We agree that this constitutional provision neither explicitly nor implicitly obligates the federal Government to pay damages, and accordingly is not by itself actionable in the Court of Federal Claims. *Cf. Connolly,* 716 F.2d at 887 (holding that the First Amendment does not by itself give rise to a cause of action for damages); *Carruth v. United States,* 224 Ct.Cl. 422, 627 F.2d 1068, 1081 (Ct.Cl. 1980) (holding that claims based on the Fifth Amendment's Due Process and Equal Protection clauses do not give rise to jurisdiction under the Tucker Act); *Walton v. United States,* 213 Ct.Cl. 755, 757 (1977). When determining jurisdiction, however, we must look to the true nature of the underlying action. *See Katz v. Cisneros,* 16 F.3d 1204, 1207 (Fed.Cir. 1994); *Livingston v. Derwinski,* 959 F.2d 224, 225 (Fed.Cir.1992). Here, Terran's claim for relief is based on the Vaccine Act and is a claim for money—that is, compensation under the Act. Therefore, the Vaccine Act is the "Act of Congress" which forms the basis of Terran's claim, and there is little dispute that such a claim is one for presently due money damages. Indeed, we note that the Vaccine Act itself gives jurisdiction to the Court of Federal Claims to determine whether Terran is entitled to compensation, independent of the Tucker Act. *See* 42 U.S.C. § 300aa–12(a) (1994).

Because jurisdiction is proper, the Court of Federal Claims had the power to address Terran's argument based on the Constitution. *See Beck v. Secretary,* 924 F.2d 1029, 1036 (Fed.Cir.1991) ("It is, however, reasonable to infer that the [Vaccine] Act must confer on the Claims Court that power which is necessary to adjudicate the controversy before it."); *compare Connolly,* 716 F.2d at 887 (holding that the Court of Claims did not have jurisdiction over plaintiff's First Amendment claim of improper removal) *with Jackson v. United States,* 192 Ct.Cl. 765, 428 F.2d 844, 846 (Ct.Cl.1970) (holding that the Court of Claims did have jurisdiction over plaintiff's statutory claim for back pay, including ar-

guments based on the First Amendment). We are therefore convinced that Terran's claim for compensation under the Vaccine Act properly lies within the jurisdiction of the Court of Federal Claims, unless ousted on the second ground decided by the court.

**B**

The Court of Federal Claims also held that a provision in the Vaccine Act providing for immediate judicial review of rules promulgated under the Act precluded it from reviewing Terran's challenge to the validity of the 1995 Table. That statutory review provision states:

> A petition for review of a regulation under this part may be filed in a court of appeals of the United States within 60 days from the date of the promulgation of the regulation or after such date if such petition is based solely on grounds arising after such 60th day.

42 U.S.C. § 300aa–32 (1994). The Court of Federal Claims held that this provision requires a party challenging regulations promulgated under the Act to raise such challenges within 60 days if the factual basis for such a challenge existed at that time. *See Terran v. Secretary of Dept. of Health & Human Services,* 41 Fed.Cl. 330 (Fed.Cl.1998). Because Julie experienced seizures as early as 1992 and had a diagnosed neurological condition by November 1993, the court held that Terran could have challenged the 1995 Table in March 1995, when it was promulgated, and was barred from doing so now. *See id.*

Again, we disagree with the jurisdictional analysis by the Court of Federal Claims. The first and most important step when interpreting a statute is, of course, analyzing its text. It is significant that the language of section 300aa–32 conferring jurisdiction on federal appellate courts is permissive in nature—parties *may* file a petition for review of regulations promulgated under the Vaccine Act in the courts of appeals within 60 days of their enactment. The statutory language does not explicitly *require* a party to challenge reg-

ulations under the Vaccine Act within such time period and in such a forum. Therefore, we cannot say that Congress clearly intended to limit judicial review to the 60–day period. The language in section 300aa–32 thus differs from the mandatory language found in some other statutory review clauses. *See Eagle–Picher Industries v. EPA,* 759 F.2d 905, 911 (D.C.Cir. 1985) (holding that a statutory provision of CERCLA clearly foreclosing later judicial review of matters that could have been raised in the ninety day statutory period bars a later challenge).

 Nevertheless, we recognize that there are cases in which courts have held that statutory review provisions specifying a limited time period for challenging regulations in a particular forum preclude later challenges to those regulations. The District of Columbia Circuit, for example, has held that statutory time limits on review of agency rulemaking can foreclose subsequent challenges to those rules. *See, e.g., Eagle–Picher,* 759 F.2d at 911; *Natural Resources Defense Council v. NRC,* 666 F.2d 595, 601–03 (D.C.Cir.1981). These cases, however, do not support the Government's broad contention that review of vaccine regulations is never proper after expiration of the 60–day statutory review period. In *Eagle–Picher,* for example, the statutory provision at issue was section 113(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") which, as already mentioned, specifically stated that agency rules had to be challenged within 90 days, and any matter which could have been raised in that time period was not subject to later judicial review. *See* 42 U.S.C. § 9613(a) (1982); *Eagle–Picher,* 759 F.2d at 911. More importantly, the case law provides several exceptions under which subsequent judicial review of a regulation would still be proper. *See Public Citizen v. NRC,* 901 F.2d 147, 152 & n. 1 (D.C.Cir.1990); *NLRB Union v. Federal Labor Relations Auth.,* 834 F.2d 191, 195–96 (D.C.Cir.1987); *Eagle–Picher,* 759 F.2d at 913–14 & n. 45; *Natural Resources Defense Council,* 666 F.2d at 602 & nn. 47–

49. One important exception is that when a party seeks to challenge a regulation on substantive grounds of invalidity, such as that the regulation was not authorized by legislation, review may still be had. *See Public Citizen,* 901 F.2d at 152 & n. 1; *Natural Resources Defense Council,* 666 F.2d at 602. This is especially true when the subsequent challenge occurs in an agency enforcement proceeding. *See NLRB Union,* 834 F.2d at 195–196 ("As applied to rules and regulations, the statutory time limit restricting judicial review of [agency] action is applicable only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further [agency] action applying it.") (quoting *Functional Music, Inc. v. FCC,* 274 F.2d 543, 546 (D.C.Cir.1958)); *see also Cronin v. FAA,* 73 F.3d 1126, 1131 n. 3 (D.C.Cir.1996) (stating that airline pilots could challenge the legality of an FAA regulation in subsequent enforcement actions against them).

Terran's claim in this case—that the 1995 Table is an invalid regulation because that section of the Vaccine Act authorizing its creation is unconstitutional—is a substantive challenge to the validity of the 1995 Table. In addition, the Special Master clearly applied the 1995 Table to Terran's claim for compensation in an adjudication, which in many ways is similar to the agency actions discussed in *NLRB Union* and *Functional Music.* Therefore, even if section 300aa–32 generally bars subsequent litigation over the validity of vaccine regulations, Terran falls within both well established exceptions identified above. We therefore conclude that 42 U.S.C. § 300aa–32 does not preclude the Court of Federal Claims from exercising jurisdiction over Terran's substantive challenge to the validity of the 1995 Table.

### III

We turn next to the substance of Terran's constitutional challenge to the Vac-

cine Act. Terran raises two theories as to why 42 U.S.C. § 300aa–12(c), which authorizes the Secretary to promulgate a revised Vaccine Injury Table, is unconstitutional. First, Terran claims that section 300aa–12(c) authorizes the Secretary to amend part of a statute, namely the Vaccine Injury Table found in section 300aa–12(a), via administrative rulemaking, and therefore contravenes the Presentment Clause of the Constitution. *See* U.S. Const. art. I, § 7, cl. 2. Alternatively, Terran contends that the Vaccine Act effects an unconstitutional delegation of legislative authority to the Secretary.

### A

■ The Presentment Clause requires, in relevant part, that "[e]very Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it," U.S. Const. art. I, § 7, cl. 2. There is no dispute that the Secretary's actions here did not fulfill the bicameralism and presentment conditions required of legislative acts by the Presentment Clause; the only question, therefore, is whether the Presentment Clause applies to the Secretary's promulgation of the regulation establishing the 1995 Table.

■ The Presentment Clause is inapplicable to administrative rulemaking in general, of course, because rulemaking is by definition not a legislative act, but rather an exercise of executive function properly entrusted to administrative agencies. *See, e.g., American Trucking Assns., Inc. v. United States,* 344 U.S. 298, 310–13, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Nevertheless, because the Initial Table was made a part of the Vaccine Act, *see* 42 U.S.C. § 300aa–14(a) (1994), Terran insists that the Secretary's power to modify the Table effectively allows her to amend or repeal part of a statute, and thus violates the Presentment Clause. Terran argues that this result is dictated by the Supreme Court's decisions in *Clinton v. New York,* 524·U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d

393 (1998), in which the Court held that the Line Item Veto Act violates the Presentment Clause, and *INS v. Chadha,* 462 U.S. 919, 954–59, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), in which the Court struck down a legislative veto provision in a statute.

■ The Constitution does not authorize members of the executive branch to enact, amend, or repeal statutes. *See Clinton,* 524 U.S. at 438, 118 S.Ct. 2091. Instead, this legislative power is vested exclusively in Congress, and the exercise of such legislative power must follow the procedures set forth in the Constitution. *See Chadha,* 462 U.S. at 954, 103 S.Ct. 2764 ("Amendment and repeal of statutes, no less than enactment, must conform with Art[icle] I."). The critical question in this case is therefore whether the Secretary's action in promulgating the 1995 Table should properly be understood as an amendment or a repeal of an existing law.

We are convinced that the Vaccine Act does not authorize the Secretary to amend or repeal portions of the Act, but rather merely grants her the power to promulgate new regulations as contemplated in the Act. First, as a formal matter, the Act does not in fact allow the Secretary to explicitly amend the Initial Table. Although we acknowledge that the statutory language in section 300aa–14(c) refers to the Secretary's ability "to modify" and "to amend" the Vaccine Injury Table, 42 U.S.C. § 300aa–14(c)(1), (2) (1994), a closer reading of that section makes clear that when the Secretary acts pursuant to section 300aa–14(c), she does not change in any way the original injury table found in section 300aa–14(a), but rather promulgates an entirely new vaccine injury table. This new table applies only prospectively. *See* 42 U.S.C. § 300aa–14(c)(4) (1994). The Initial Table remains codified and unaltered, and continues to apply to all petitions filed before the revision. Therefore, the Initial Table is not amended.

Realizing this, Terran argues instead that the Act *effectively* allows the Secre-

tary to amend the Initial Table. However, we are not persuaded that the regulatory regime established by the Vaccine Act raises concerns under the Presentment Clause. When it created the Vaccine Act, Congress realized that the Initial Table contained flaws. *See, e.g.,* H.R.Rep. No. 99–908, at 18, *reprinted in* 1986 U.S.C.C.A.N. 6344, 6359. Congress therefore directed the Secretary to commission studies on the link between vaccines and injuries, and created a panel to oversee the collection of data on vaccine related injuries. *See* National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–660 §§ 312–13, 100 Stat. 3755, 3779–82 (1986); 42 U.S.C. § 300aa–19 (1994). Congress directed the Secretary to revise the Initial Table based on the information obtained from such studies. *See, e.g.,* National Childhood Vaccine Injury Act of 1986, 100 Stat. at 3779–80. Congress therefore clearly intended that the Initial Table would cease to apply to newly filed petitions when the Secretary promulgated a revised injury table. *See id.* § 300aa–14(c)(4). This aspect of the Vaccine Act is similar to "sunset" provisions that Congress routinely includes in legislation to specify the date on which a particular piece of legislation ceases to have effect. *See, e.g.,* 28 U.S.C.A. § 599 (West Supp. 1999) (specifying that Title 28, Chapter 40 of the United States Code—authorizing the appointment of independent counsels— ceases to be effective five years after the date of enactment of the Independent Counsel Reauthorization Act of 1994). Here, of course, the Vaccine Act does not specify a date certain on which the Initial Table becomes ineffective; instead, the Secretary's promulgation of a revised injury table triggers the ineffectiveness of the Initial Table. Because Congress itself decided to render the Initial Table ineffective upon the Secretary's action, this statutory design does not violate the Presentment Clause. *See Clinton,* 524 U.S. at 446 & n. 40, 118 S.Ct. 2091 (stating that the Supreme Court's power to "repeal" laws by promulgating rules of procedure for the lower federal courts does not run afoul of

the Presentment Clause because "Congress itself made the decision to repeal prior rules upon the occurrence of a particular event—here, the promulgation of procedural rules by this Court").

The Supreme Court's recent decision in *Clinton v. New York* is not to the contrary. In holding the Line Item Veto Act unconstitutional in *Clinton,* the Court identified three factors distinguishing that statute from the one at issue in *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), in which the Court upheld the constitutionality of the Tariff Act of 1890 that authorized the President to suspend legislatively-enacted import duty exemptions on certain goods whenever he felt that the exporting country was treating United States products unfairly. *See Clinton,* 524 U.S. at 442–43, 118 S.Ct. 2091; Act of Oct. 1, 1809, § 3, 26 Stat. 612. First, the Court noted that the President's suspension power under the Tariff Act was contingent on conditions that did not exist when that law was passed, whereas the five-day time limit for canceling an appropriations line item under the Line Item Veto Act meant that the President's action was necessarily based on the same conditions contemplated by Congress. *See id.* at 443, 118 S.Ct. 2091. In the Vaccine Act, as in the Tariff Act, Congress anticipated that the facts underlying its legislation might change in the future. *See, e.g.,* 42 U.S.C. § 300aa–19 (1994) (establishing the Advisory Commission on Childhood Vaccines and directing it to compile information relating to vaccine injury statistics), § 300aa–14(d) (1994) (requiring the Secretary to solicit comments from the Advisory Commission before promulgating a revised injury table). As a result, Congress intended the Secretary to promulgate revised injury tables when more accurate information linking vaccines to injuries became available. *See* National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–360, § 312, 1986 U.S.C.C.A.N. (100 Stat.) 3755, 3779–80.

Second, the *Clinton* Court noted that the Line Item Veto Act provided little constraint on the President's discretion to cancel a particular appropriation line item, whereas his discretion was much more channeled under the Tariff Act. *See Clinton*, 524 U.S. at 443–44, 118 S.Ct. 2091. This factor also suggests that the delegation of power found in the Vaccine Act is proper. Although the Secretary ultimately has the discretion to either promulgate a revised table or not, Congress set forth detailed procedures and substantive considerations in the Vaccine Act that channel this discretion. For example, the Act requires the Secretary to respond to petitions made by "[a]ny person" to modify the vaccine injury table, unless the petition is clearly frivolous. 42 U.S.C. § 300aa–14(c)(2) (1994). Importantly, the Act sets forth both procedural requirements that govern regulations to modify the injury table, *see* 42 U.S.C. § 300aa–14(c)(1) (requiring notice and comment rulemaking, a 180–day comment period, and opportunity for a public hearing), advisory bodies that the Secretary is required to consult, *see id.* § 300aa–14(d) (requiring the Secretary to solicit input from the Advisory Commission), and substantive requirements for the revised injury tables, *see id.* § 300aa–14(e) (requiring the Secretary to revise the vaccine injury table to include all recommended childhood vaccines).

Finally, the *Clinton* Court considered it important that the President was fulfilling Congress's policy under the Tariff Act when he suspended certain import duty exemptions, whereas he was clearly contravening Congress's policy judgment when he canceled spending items under the Line Item Veto Act. *See Clinton*, 524 U.S. at 444, 118 S.Ct. 2091. The brief outline of the Vaccine Act already provided above demonstrates compellingly that the Secretary was executing congressional policy when she promulgated the 1995 Table. Indeed, the Act explicitly directed the Secretary to study pertussis vaccines and to promptly promulgate a revised injury table based on such findings. *See* National Childhood Vaccine Injury Act of 1986,

Pub.L. No. 99–360, § 312, 1986 U.S.C.C.A.N. (100 Stat.) 3755, 3779–80. Thus, we conclude that the Secretary's actions in this case are controlled by *Field v. Clark*, rather than *Clinton*.

Under section 300aa–14(c) of the Vaccine Act, the Secretary does not have power to amend the original, legislatively-enacted Vaccine Injury Table. Instead, the Secretary merely has the power to promulgate revised injury tables that reflect current knowledge linking childhood vaccines to injuries. Congress intended that these improved tables provide the basis for compensation under the Act. We therefore conclude that section 300aa–14(c) of the Vaccine Act does not violate the Presentment Clause.

## B

We next consider Terran's argument that, by granting the Secretary the power to promulgate revised vaccine injury tables, the Vaccine Act effects an unconstitutional delegation of legislative power to the Secretary. Under the "nondelegation doctrine," Congress may "seek[ ] assistance from another branch" of the Government, as long as "the extent and character of that assistance [are] fixed according to common sense and the inherent needs of Governmental co-ordination." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 48 S.Ct. 348, 72 L.Ed. 624 (1928). Accordingly, "[i]f Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.* at 409, 48 S.Ct. 348.

We have little doubt that the Vaccine Act sets forth such an intelligible principle to guide the Secretary's actions. Again with reference to the statute, Congress has provided the Secretary with both substantive guideposts and procedural requirements that must be observed. For example, the Initial Table in the Act itself operates as an intelligible principle that

governs subsequent, administratively created tables. In the Initial Table, Congress identified the vaccines covered by the table, the illnesses or conditions for which compensation might be had, and the time period required for the first symptom or onset of each illness or condition. *See* 42 U.S.C. § 300aa–14(a) (1994). Although Congress gave the Secretary the power to revise the Initial Table by regulation, revised tables must adhere to this same format. *See id.* § 300aa–14(c)(3) (authorizing the Secretary to add or delete from the list of illnesses and conditions, and to change the time periods). And although the Secretary could in theory delete all entries in the table or, conversely, sweep in all possible illnesses or conditions, the Act constrains the Secretary's discretion. First, the Vaccine Act requires the Secretary to consult with the Advisory Commission on Childhood Vaccines before proposing rules to revise the injury table. *See id.* § 300aa–14(d). This Commission comprises health professionals, members of the public with family members who have suffered vaccine-related injuries or death, and legal representatives of vaccine victims and vaccine manufacturers, and is charged with the task of gathering information on vaccine-related injuries. *See id.* § 300aa–19. The Act also provides for automatic termination of the compensation program if the total number of awards exceeded a specified number within time frames established by Congress. *See id.* § 300aa–34. More generally, the Vaccine Act establishes a broad program to study and reduce the risk of childhood vaccines. *See, e.g.,* National Childhood Vaccine Injury Act of 1986, Pub.L. No. 99–360, §§ 312(a)-(d), 313(a), 1986 U.S.C.C.A.N. (100 Stat.) 3755, 3779–82 (directing the Secretary to request that the Institute of Medicine of the National Academy of Sciences conduct studies exploring the link between childhood vaccines with certain illnesses). Congress clearly intended the Secretary to be guided by the findings from such studies when she decides to promulgate regulations to revise the injury table. *See id.* § 312(c)-(d), 100 Stat. at 3780; 42 U.S.C. § 300aa–14(d) (1994).

Congress provided ample guidance and limits on the Secretary's authority to promulgate revised vaccine injury tables, and thus Congress's commitment of power to the Secretary under the Vaccine Act does not violate the nondelegation doctrine. Accordingly, the 1995 Table is a valid regulatory enactment.

## IV

### A

Having determined that the 1995 Table is valid, we finally turn to the merits of the case. Terran's first argument in favor of reversal, notwithstanding the validity of the regulations at issue, is that the 1995 Table should not apply to her, because her claim arose before the effective date of the regulations. That is, Terran argues that because Julie was assertedly injured by a vaccination on August 10, 1992, her claim arose well before the March 1995 effective date of the Table regulations. Terran suggests that to apply the 1995 Table to her case would work an impermissible retroactive application of law. We disagree.

While we concur with Terran's authoritative citation that "retroactivity is not favored in the law," *see Landgraf v. USI Film Prods.,* 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), it does not follow that the 1995 Table does not apply to her case. For it is equally clear that "where congressional intent is clear, it governs." *Id.* (quoting *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 837, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990)). Here, the statute specifically states that newly-promulgated Table regulations "shall apply only with respect to petitions for compensation under the Program which are filed after the effective date of such regulation." 42 U.S.C. § 300aa–14(c)(4) (1994). Terran's claim was filed in July 1995, four months after the effective date of the new regulations.

*See* 42 C.F.R. § 100.3(c) (1996). This conclusively resolves the question; the 1995 Table applies to Terran's claims. *See Kaiser Aluminum*, 494 U.S. at 837–38, 110 S.Ct. 1570.

### B

Terran next argues that the Special Master erred in discounting the causation-in-fact testimony of her expert. The Special Master, applying the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), determined that the expert's theory regarding the causal link between the pertussis toxin and Julie's condition did not meet the standards for scientific reliability enunciated in *Daubert.*

 Terran first argues that the application of *Daubert* to this realm of expert knowledge, "general medical issues," was erroneous. She suggests that the *Daubert* framework is narrowly intended to prevent the introduction of "junk science" into trials, rather than as a broader tool for analyzing the admissibility of scientific testimony. We disagree. To the extent we had any doubt at all regarding the permissible use of the *Daubert* framework outside the "scientific" areas specifically discussed in that case, the Supreme Court's recent decision in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), has clarified the issue. *Kumho Tire* specifically notes that the general principles of *Daubert* apply broadly to "scientific, technical, or other specialized knowledge," and that the rules of evidence require that the trial judge determine "whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* at ——, 119 S.Ct. at 1175 (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786). Thus, the Special Master did not err in analyzing the proffered testimony according to *Daubert.*

 Terran next argues that the Special Master improperly applied the *Daubert* factors to the expert's testimony. In particular, Terran suggests that the Special Master erred by requiring the evidence to meet each of the four *Daubert* factors.[2] However, we do not read the Special Master's decision as requiring that Terran's proffered evidence meet all of the *Daubert* factors. Instead, we view the Special Master's analysis as using *Daubert's* questions as a tool or framework for conducting the inquiry into the reliability of the evidence. *See Kumho Tire*, 526 U.S. at ——, 119 S.Ct. at 1175 ("[Daubert's] list of factors was meant to be helpful, not definitive."). The Special Master found that the *Daubert* inquiry raised serious questions about the testimony, and thus concluded that the proffered theory of causation was not sufficiently reliable. *See Terran v. Secretary of Health & Human Services*, No. 95-45IV, slip op. at 14 (Fed. Cl. (Special Master) Jan. 23, 1998). Because we view the Special Master's application of the *Daubert* factors to be reasonable, *see Kumho Tire*, 526 U.S. at ——, 119 S.Ct. at 1176 ("[A] trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony."), and do not discern any abuse of discretion in the analysis, *see Burns v. Secretary of Dept. of Health & Human Services*, 3 F.3d 415, 416–17 (1993) (reviewing the Special Master's evidentiary determinations for abuse of discretion), we affirm the Special Master's decision to discount the testimony.

### C

 Terran's final argument is that the Special Master, and thus the Court of Federal Claims, did not address her "straightforward" causation-in-fact argu-

---

**2.** The *Daubert* factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and, (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. *See Daubert*, 509 U.S. at 592–95, 113 S.Ct. 2786.

ment. That is, Terran suggests that while the Special Master rejected her proffered theory of the mechanism of Julie's injury, that court failed to consider whether an alternative and more straightforward clinical explanation of causation was nonetheless correct. As the Court of Federal Claims noted, however, Terran's "straightforward" argument rests entirely upon factual matters resolved against her, as well as upon those which have been held to be insufficient to establish a *prima facie* case. *See Terran v. Secretary of Dept. of Health & Human Services,* 41 Fed.Cl. 330, 337 (Fed.Cl.1998). For example, Terran points to the temporal association of the seizures with the DPT vaccination, which has been held to be insufficient proof of causation. *See Hasler v. United States,* 718 F.2d 202, 205 (6th Cir.1983). Terran also posits that Julie exhibited a unique seizure disorder, even though this requires agreement with the expert testimony rejected as unreliable by the Special Master. In short, our review of the record has not uncovered any finding of fact or conclusion of law that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa-12(e)(2)(B) (1994). We thus are compelled to affirm the Special Master's rejection of Terran's causation-in-fact claim.

### V

In summary, we hold that the Vaccine Act does not violate either the Presentment Clause of the Constitution or the nondelegation doctrine that emanates from separation of powers principles. We affirm the ruling by the United States Court of Federal Claims that the 1995 Table applies to these facts, and that Terran failed to present a prima facie case for compensation under the Act.

### COSTS

No costs.

*AFFIRMED*

PLAGER, Circuit Judge, dissenting.

Under the United States Constitution, Congress may legislatively declare the rights and liabilities of its citizens in one, and only one, way, and that is by a "Bill which shall have passed the House of Representatives and the Senate, [and] shall, before it becomes a Law, be presented to the President of the United States" for approval or veto. U.S. Const. art. I, § 7, cl. 2 ("the Presentment Clause"); *see also Clinton v. New York,* 524 U.S. 417, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998). Neither one House of Congress acting alone, *see INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), nor the President or other Executive Branch official may constitutionally enact, amend, or repeal statutes. *See Clinton,* 524 U.S. at 438, 118 S.Ct. 2091 ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

In this case, Congress purported to provide for the amendment of existing legislation, which was otherwise valid and enforceable by the courts of the United States, in a manner different from that provided in the Constitution, namely by authorizing an Executive Branch official to do it. That effort must necessarily fail. The majority's valiant effort to uphold the purported amended legislation must also fail, since no amount of verbal adroitness can change the reality of what happened. I respectfully dissent.

### 1.

The essentials of this case are simple. In 1986 Congress enacted legislation, approved by the President, which entitled persons injured by certain childhood vaccines to a financial recovery paid from the Treasury of the United States. The legislation, inter alia, set out in detail the particulars of certain injuries caused by the specified vaccines and the evidence of their happening; if a person established those particulars, he or she was entitled to a recovery. The injuries thus described were known as "table injuries", since the particulars were set out in the legislation in the form of a Vaccine Injury Table. *See*

42 U.S.C. § 300aa–14(a) (1994). Under the legislation as enacted, the detailed provisions contained in the table remain in effect indefinitely, that is, no "sunset" or automatic termination provision was included in the legislation.

In a separate subsection of the legislation, § 300aa–14(c)(1)–(4), Congress purported to enable an Executive Branch officer, the Secretary of Health and Human Services, to amend the statute by changing the particulars contained in the table. The Secretary had authority "to modify" the table, § 300aa–14(c)(1); she could "add to, or delete from, the list of injuries, disabilities, illnesses, conditions, and deaths for which compensation may be provided . . . ." § 300aa–14(c)(3). No restraints were placed upon the Secretary's exercise of the power—the power could be exercised at the discretion of the Secretary, when and as the Secretary chose—other than procedural steps which required, among other things, that the Secretary first confer with her Advisory Commission on Childhood Vaccines, and that the action be in the form of a rulemaking.

Some years later, in 1995, the Secretary chose to exercise that power, and purportedly amended the statute. Plaintiff–Appellant in this case alleges that she would be entitled to an award under the terms of the Congressionally-enacted table, but that under the table as amended by the Secretary she is not so entitled. She challenges the application of the amended statute to her case.

Given the clarity with which the Constitution speaks to this question, and the Supreme Court's unequivocal honoring of the Presentment Clause in *Chadha* and *Clinton*, one might suppose that this would be a not-difficult case to decide. The majority, however, seeks to find a way around the Constitution, and it is to that effort that I now turn.

## 2.

As a preliminary matter, I agree with the result reached by the majority in Part IIA of its opinion, i.e., that the Court of Federal Claims has jurisdiction to adjudicate Terran's constitutional challenges to the Vaccine Act, though I cannot join the majority's convoluted analysis in reaching that conclusion. The majority devotes considerable energy to analyzing whether Terran's claim is for money damages. The "money damages" requirement for claims before the Court of Federal Claims arises from that court's jurisdiction under the Tucker Act. *See, e.g., United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). While it is true that the Court of Federal Claims is a court of limited jurisdiction, the Tucker Act is not the only statute expressly granting that court jurisdiction.

As the majority seems to recognize, slip op. at 1314, the Vaccine Act itself provides the Court of Federal Claims with jurisdiction to determine whether Terran is entitled to compensation and the amount of such compensation. *See* 42 U.S.C. § 300aa–12(a) (1994); *Beck v. Secretary of the Dep't of Health and Human Servs.,* 924 F.2d 1029, 1036 (Fed.Cir.1991). This grant of jurisdiction is independent of any jurisdictional grant under the Tucker Act. It is therefore unnecessary to consider, as the Court of Federal Claims did, whether Terran's constitutional challenge to the Vaccine Act is based on a "money-mandating provision" of the Constitution. The only question we need address is whether in exercising its jurisdiction under the Vaccine Act, the Court of Federal Claims may properly consider the constitutional issues presented.

The Court of Federal Claims has jurisdiction "to determine if a petitioner . . . is entitled to compensation under the [National Vaccine Injury Compensation] Program." 42 U.S.C. § 300aa–12(a). Terran raises her constitutional challenge as part of a claim for compensation over which the Court of Federal Claims clearly has jurisdiction. Resolution of that constitutional challenge directly impacts the determina-

tion of whether Terran is entitled to compensation. As the majority correctly concludes, the Vaccine Act gives the Court of Federal Claims the power that is necessary to decide the issue of Terran's compensation, including the power to address the constitutional challenge to the Vaccine Act. *See Beck,* 924 F.2d at 1036; *see also Rodriguez v. Secretary of the Dept. of Health and Human Services,* 34 Fed.Cl. 57 (1995) (addressing petitioner's claim that special master's interpretation of § 11(c)(1)(D)(i) of the Vaccine Act violates the Equal Protection clause of the Constitution), *aff'd sub nom. Black v. Secretary of Health and Human Services,* 93 F.3d 781 (Fed.Cir.1996).

Moving on to Part IIB of its opinion, the majority there considers at some length whether 42 U.S.C. § 300aa–32 precludes the Court of Federal Claims from reviewing Terran's constitutional claims; the majority concludes it does not. Again, I agree with the majority's conclusion, but I get there simply because § 300aa–32 is irrelevant to the constitutional challenges at issue here.

By its plain language, § 300aa–32 provides for the review of a *regulation* promulgated under the Vaccine Act. The purpose of the 60–day review period limitation is to preclude a later-filed challenge to the correctness of the administrative action, for example, a challenge that the Secretary did not follow proper rulemaking procedures in creating the revised table, or exceeded the scope of authority the statute granted. That type of challenge was often raised in enforcement actions in other areas, environmental law being an example, until Congress inserted counterparts of § 300aa–32 into the appropriate statutes.

Terran's claim in this case is not a challenge to the manner of promulgation or to the content itself of the regulation that amended the 1995 Table. It is instead a challenge to the underlying enabling statute, 42 U.S.C. § 300aa–14(c), that purports to give the Secretary the power to promulgate the regulation at all. Section 300aa–32 does not govern review of the statute.

Thus, I find the majority's discussion of whether § 300aa–32 is intended to be always permissive (which I think is simply wrong), and the circumstances, if any, under which judicial review of a regulation beyond the 60–day period is proper, to be unnecessary to the decision in the case.

3.

The heart of my dissent lies in my disagreement with the majority's conclusion in Part IIIA that 42 U.S.C. § 300aa–14(c) does not violate the Presentment Clause of the Constitution. (The majority opinion initially states the question to be one of "separation of powers principles," slip op. at 1306, but, as the Supreme Court observed in *Clinton,* 524 U.S. at 448, 118 S.Ct. 2091, the question of compliance with Art. I, § 7 is a distinctly different question from the question of whether a statute "impermissibly disrupts the balance of powers among the three branches of government.")

Congress enacted into law the initial version of the Vaccine Injury Table by following proper enactment and presentment procedures in accordance with Article I of the Constitution. As noted, the Supreme Court as recently as last year has made clear that the Presentment Clause requires that any modification to a statute must follow those same procedures. *See Clinton,* 524 U.S. at 448–49, 118 S.Ct. 2091. Because 42 U.S.C. § 300aa–14(c) gives the Secretary unilateral power to amend the Vaccine Injury Table without complying with the bicameralism and presentment procedures required for legislative acts, the statute violates the Presentment Clause.

The majority holds that the Vaccine Act does not authorize the Secretary to *amend* the original Vaccine Injury Table, but that it merely authorizes the creation of an entirely new table by regulation, the new table of course superseding the old one. That is little more than a transparent attempt to find a verbal formula for disguising the reality of what transpired. The

Vaccine Act explicitly provides that the "Secretary may promulgate regulations to *modify* . . . the Vaccine Injury Table." 42 U.S.C. § 300aa–14(c) (1994) (emphasis added). Despite this admission by Congress that it intended to give the Secretary the power to amend the Vaccine Injury Table, the majority concludes that no amendment occurred because the initial Vaccine Injury Table remains codified in its original form.

Indeed, the crux of the majority's argument derives from the following syllogism: "This new table applies only prospectively. . . . The Initial Table remains codified and unaltered, and continues to apply to all petitions filed before the revision. Therefore, the Initial Table is not amended." Slip op. at 1313. The unstated major premise is that an amendment that leaves the earlier provision unrepealed means that the earlier provision is not "amended." It does not require much analysis to recognize the fundamental flaw in that argument.

When Congress changes an existing law, for example by increasing the amount of a penalty for prohibited conduct, or by modifying the criteria for an entitlement, it is almost invariably the case that the provisions of the original statute remain in effect for all cases arising prior to the effective date of the amendment, and that the changed requirements apply only prospectively, to newly-arising matters. As the Supreme Court has admonished, "retroactivity [of legislation] is not favored in the law." *Landgraf v. USI Film Products*, 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), with the result that Congress rarely makes such changes retroactive. Under the majority's syllogistic reasoning, it would follow that Congress does not "amend" a statute when it makes changes in existing legislation, and leaves the earlier enactment unrepealed; only in the rare case of total repeal with retroactivity is the change an "amendment." That conclusion takes generally understood legal terminology and stands it on its head.

Putting aside such verbal obfuscation, what is clear is that, as a result of the regulation promulgated by the Secretary in 1995, the initial Vaccine Injury Table is no longer legally effective with regard to cases arising after the effective date of the amendment. The Secretary has deleted a provision which, but for the deletion, would be available for the benefit of persons like Terran. Absent the regulation, the original Vaccine Injury Table would continue to apply to Terran and all others similarly situated; with the regulatorily-amended Table, only the amended table applies to those who file their petitions after the effective date of the regulation.

It matters not whether we say, as the majority says, that the original Vaccine Injury Table was not amended, but that just a new Table was put into law, or whether we acknowledge the obvious reality that the then-existing Table was effectively amended by the regulation. The result is the same—the statutory table as enacted by Congress does not apply to petitions filed after the Secretary's regulation took effect. To paraphrase the words the Supreme Court used in *Clinton*, "[i]n both legal and practical effect, the [Secretary] has amended [an Act] of Congress by repealing a portion of [it]," and "[t]he cancellation of one section of a statute may be the functional equivalent of a partial repeal even if a portion of the section is not canceled." *Clinton*, 524 U.S. at 438, 441, 118 S.Ct. 2091.

In further support of its judgment, the majority suggests that the statute by inference has a "sunset" provision. That simply is not the case. Congress did not decide when the initial Vaccine Injury Table would become ineffective, either by specifying a date or by defining a particular event that would render the initial table ineffective. To suggest, as the majority does, that the Secretary's action is an event selected by Congress to trigger the effective repeal of the initial Vaccine Injury Table is nothing more than circular reasoning, for it is the Secretary's action in

amending the table that itself "repeals" the initial Vaccine Injury Table.

Congress could have chosen to write the statute differently. If Congress in the Vaccine Act had specified certain external events upon the happening of which the enacted table became no longer effective, and at which time the Secretary was to create a revised injury table, and left to the Secretary the determination of when the specified events in fact occurred, the analysis *might* be different. *See Clinton,* 524 U.S. at 445, 118 S.Ct. 2091 (explaining that the Tariff Act of 1890 was upheld in *Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294 (1892), because "Congress itself made the decision to suspend or repeal the particular provisions at issue upon the occurrence of particular events subsequent to enactment, and it left only the determination of whether such events occurred up to the President"). But we are not presented with such a situation. The Vaccine Act gives the Secretary complete authority to modify the table, unrestrained by any prerequisite conditions established by Congress, beyond those procedural steps alluded to earlier.

As an alternative, in enacting the Vaccine Act Congress, presumably without violating the Constitution, might have established appropriate criteria under which the Secretary was given authority to create the initial table through an administrative rulemaking procedure, along with the power to revise the table from time to time consistent with those criteria. Congress, however, did not choose this route either, and instead, for whatever reason, included the initial Vaccine Injury Table in the statute itself. Having done so, Congress can render the enacted statute inapplicable to those who come within it only by repealing or amending the statute in compliance with the bicameralism and presentment procedures of Article I of the Constitution.

The majority's statement, slip op. at 1313, that Congress intended that the Secretarially-revised table would supersede its statutory table is irrelevant. *See Clinton,* 524 U.S. at 445–46, 118 S.Ct. 2091 ("The fact that Congress intended such a result is of no moment."). Thus there is little question that § 300aa–14(c), as Congress wrote it and which purports to empower the Secretary to modify the statutorily-created Vaccine Injury Table, violates the Presentment Clause of the Constitution.[1]

4.

Words have consequences. The Constitution's constraints have served us well. Judges regularly attend to the constraints the Constitution places upon their own performance, such as the requirement for a genuine "case" or "controversy" before a federal court may exercise judicial power. *See* U.S. Const. art. III, § 2. When a case is before us, it is our obligation under the law to ensure that the other Branches equally conform to the Constitution's mandates, even when doing otherwise would seem to be simpler or more convenient.

Because I would hold that the 1995 attempt by the Secretary to revise the initial Vaccine Injury Table is of no legal effect, I would not reach Plaintiff's alternative theory of causation-in-fact which the majority addresses in Part IV of its opinion. Instead, I would vacate the judgment of the Court of Federal Claims, and remand the case to that court with instructions to analyze Terran's claims under the legislatively-enacted table in 42 U.S.C. § 300aa–14(a), and to process her claims accordingly. I respectfully dissent from the contrary conclusion reached by the majority.

---

**1.** Because I conclude that 42 U.S.C. § 300aa–14(c) clearly violates the Presentment Clause, I find it unnecessary to address the more difficult question of whether the statute as written complies with the minimum require-ments for a valid delegation of legislative power, the issue considered by the majority in Part IIIB. Therefore, I do not join that part of the majority's opinion.